UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - :
                                      :
U.S INFORMATION SYSTEMS, INC.,        :
ODYSSEY GROUP, INC. and BLUE          :
DIAMOND FIBER OPTIC NETWORKS, INC.,   : 00 Civ. 4763 (RMB)(JCF)
                                      :
              Plaintiffs,             :
                                      :
    - against -                       :
                                      :         MEMORANDUM
INTERNATIONAL BROTHERHOOD OF          :         AND  ORDER
ELECTRICAL WORKERS LOCAL UNION        :
NUMBER 3, AFL-CIO, A R COMMUNICATION  :
CONTRACTORS INC., ADCO ELECTRICAL     :
CORPORATION, FIVE STAR ELECTRIC       :
CORPORATION, FOREST ELECTRIC          :
CORPORATION, HUGH O'KANE ELECTRIC     :
COMPANY LLC, IPC COMMUNICATIONS, INC. :
and NEAD INFORMATION SYSTEMS,         :
                                      :
                                      :
              Defendants.             :
                                      :
- - - - - - - - - - - - - - - - - - - :
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

    The defendants in this antitrust action previously moved for
summary judgment.  They now seek an order striking evidence cited
in the plaintiffs' brief in opposition to the summary judgment
motion as well as portions of the plaintiffs' statement of facts
submitted pursuant to Local Civil Rule 56.1.  The defendants argue
that the plaintiffs' brief and their Local Rule 56.1 statement rely
upon inadmissible evidence and that, in addition, the plaintiffs'
Local Rule 56.1 statement fails to comply with basic requirements
of the rule.  For reasons that follow, the defendants' motion to
strike is granted in part and denied in part.

Background

    The plaintiffs are contractors who employ members of the

Communication Works of America, AFL-CIO (the "CWA") to install low-voltage telecommunications and data ("tel-data") wiring for commercial customers. The defendants are Local Union Number 3 ("Local 3"), AFL-CIO, of the International Brotherhood of Electrical Workers (the "IBEW") and several electrical contractors employing Local 3 members. The plaintiffs allege that the defendants have engaged in a concerted effort to coerce building owners, tenants, construction managers, general contractors, information technology consultants, and others in the construction industry to exclude CWA contractors from the tel-data marketplace in violation of § 1 of the Sherman Antitrust Act,[1] 15 U.S.C. § 1, and New York State's Donnelly Act, N.Y. Gen. Bus. Law § 340. (Second Complaint ("SC"), ¶¶ 36, 70-92). According to the plaintiffs, the defendants advance their conspiracy by, for example, threatening to withdraw manpower from construction sites as soon as CWA contractors show up for work, refusing to engage in overtime, and threatening and carrying out acts of vandalism on construction sites. The alleged purpose of all of these acts has been to convince commercial construction executives that hiring CWA contractors will result in delays and drive up costs. (SC, ¶ 41).

On August 26, 2005, the defendants filed a motion for summary judgment, arguing, among other things, that the plaintiffs do not have any evidence, except inadmissible hearsay, of an agreement

_____

[1] The plaintiffs initially asserted claims under §§ 1 and 2 of the Sherman Antitrust Act but have since withdrawn their § 2 claims. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. SJ Memo." at 27).

among the defendants or of illegal conduct by Local 3 contractors or union agents. The defendants further contend that, even if the plaintiffs can prove a conspiracy, they cannot prove an anti-competitive effect because the tel-data market place is a highly competitive one that allows new contractors to enter and thrive. The plaintiffs responded on November 22, 2005, with a memorandum of law opposing summary judgment, pointing to Local 3's long history of unlawful conduct against the CWA and describing multiple incidents at construction job sites from which, the plaintiffs asserted, an antitrust conspiracy could be inferred.

As required by Local Civil Rule 56.1(a) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules"), the defendants annexed a statement of material facts to their brief. (Defendants' Joint Statement of Facts About Which There Is No Genuine Dispute ("Def. Rule 56.1 Statement")). Each of the eight defendants contributed a section addressing specific allegations of misconduct. In total, the defendants' Local Rule 56.1 statement consists of 563 numbered paragraphs.

Under the Local Rules, parties opposing summary judgment must also file a statement of facts. Local Civil Rule 56.1(b). The non-moving party's statement is to respond to the facts in each of the numbered paragraphs in the moving party's statement. Accordingly, the plaintiffs here filed a Local Rule 56.1 statement with numbered paragraphs addressing each of the defendants' 563 assertions. (Plaintiffs' Response to Defendants' Joint Statement

of Purported Undisputed Facts ("Pl. Rule 56.1 Statement" or "counterstatement")).

Shortly after the parties completed their summary judgment submissions, the defendants' filed this motion seeking an order to strike eighty statements in the plaintiffs' memorandum of law and nearly every entry in the plaintiffs' Local Rule 56.1 counterstatement. Their contentions can be summarized as follows: (1) the plaintiffs rely on hearsay in their brief and their counterstatement and have failed to establish that those statements are subject to any hearsay exception; (2) they use their expert's report as a conduit for hearsay evidence in both the brief and the counterstatement; (3) they improperly rely on past judicial and agency determinations to prove Local 3's current conduct in both documents; (4) they offer documents that lack authentication; (5) their factual assertions are not supported by the evidence they cite or the evidence is irrelevant, and (6) their Local Rule 56.1 counterstatement violates the fundamental requirements of the rule.

The plaintiffs respond that statements identified as hearsay are in many instances not assertions at all but, rather, verbal acts, and that those statements that are assertions are admissible under Rule 803(3) of the Federal Rules of Evidence. They contend that they have cited their expert's report properly, even where the cited portions include hearsay, because experts are permitted to testify to opinions based on inadmissible evidence. And they argue that evidence of Local 3's battles with the CWA before the courts and the National Labor Relations Board (the "NLRB") over the years

is admissible under Rule 406 of the Federal Rules of Evidence to prove that the union's conduct in this case was in conformity with its routine practices. Finally, the plaintiffs argue that the defendants have misidentified the evidentiary burden borne by plaintiffs seeking to prove an antitrust conspiracy and that proof of the illegal agreement can rest on circumstantial evidence alone.

Because the volume of statements under dispute is so large, a roadmap is in order. This memorandum addresses the legal issues raised by the defendants' motion. To the extent that analysis permits categorical decisions about disputed evidence, I have attached an appendix showing statements covered by categorical decisions. To the extent a categorical decision is not possible, I have addressed testimony and documents individually.

Discussion

A.    Compliance with Local Rule 56.1

The defendants seek to strike statements that they contend fail to adhere to basic requirements of Local Rule 56.1. Compliance with the rule can be determined categorically.

Local Civil Rule 56.1 provides the method by which parties are to set their factual disputes before district courts in the Southern and Eastern Districts of New York. Under the rule, assertions in the moving party's statement of material facts "will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(c) (emphases in original). Every statement in the

parties' Local Rule 56.1 submissions must be supported by citations to record evidence. Local Civil Rule 56.1(d). "Rule 56.1 statements are not argument. They should contain factual assertions with citation to the record. They should not contain conclusions." Rodriguez v. Schneider, No. 95 Civ. 4083, 1999 WL 459813, at n.3 (S.D.N.Y. June 29, 1999)(emphasis in original); see also Giannullo v. City of New York, 322 F.3d 139, 142 (2d Cir. 2003) (unsupported facts in moving party's Local Rule 56.1 statement disregarded); Holtz v. Rockefeller & Co., Inc., 258 F.3d 63, 74 & n.1 (2d Cir. 2001) (same).

A non-moving party cannot create a factual dispute merely by denying a movant party's factual statement; rather, the non-moving party must identify controverting evidence for the court. See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, No. 04 Civ. 10014, 2006 WL 1493132, at *5 (S.D.N.Y. May 31, 2006); Blackmon v. Unite!, No. 03 Civ. 9214, 2005 WL 2038482, at *2 (S.D.N.Y. Aug. 25, 2005); Chimarev v. TD Waterhouse Investor Services, Inc., 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003). Moreover, plaintiffs cannot evade the impact of accepting a fact by adding legal argument to their counterstatements. Goldstick v. The Hartford, Inc., No. 00 Civ. 8577, 2002 WL 1900629, at (S.D.N.Y. Aug. 19, 2002) (defendants' motion to strike granted insofar as plaintiffs' counterstatement consisted of more than admission or denial of assertion and citation to record). This requirement goes to the very purpose of the rule, which is "to streamline the consideration of summary judgment motions by freeing district

courts from the need to hunt through voluminous records without guidance from the parties." <u>Holtz</u>, 258 F.3d at 74. Courts rely on Local Rule 56.1 to assist them "in understanding the scope of the summary judgment motion by highlighting those facts which the parties contend are in dispute." <u>Rodriguez</u>, 1999 WL 459813, at *1 n.3.

The plaintiffs here give every indication of having thrown up their hands in frustration when they encountered the defendants' 563-paragraph statement. In close to four hundred and fifty responding paragraphs, the plaintiffs object -- strenuously -- to the kind and amount of material in the defendants' statement:

> This is not a proper issue for inclusion in a Rule 56.1 Statement. Whether true or not it adds nothing to the determination to be made by the Court . . . . (Pl. Rule 56.1 Statement, ¶¶ 189, 191-96, 210-12, 396-99).

> Objection on the ground that the statement is merely the opinion of the witness, lacks foundation and is speculation, is not relevant, and is not material for purposes of a Rule 56.1. statement. (Pl. Rule 56.1 Statement, ¶¶ 295).

> Objection on the ground that the cited document speaks for itself and that this is not a material fact; thus its inclusion in a Rule 56.1 statement is inappropriate. Moreover, the assertion is argumentative and self-serving and is inconsistent with actual practice. (Pl. Rule 56.1 Statement, ¶¶ 138-43).

> Objection on the ground that what is "important" is merely the opinion of the declarant, there is no foundation for the assertion and it is speculative. Moreover, this is a circular, self-serving argument because defendants have, through their unlawful concerted action (including the threats of a refusal to provide overtime, threats of sabotage, threats of vandalism and the actual occurrences of such actions) fostered the concern among building owners and other end users that there might be labor disharmony if a CWA contractor is utilized on a construction project. Thus, defendants have creatred the need for dispute resolution before the

Building and Construction Trade Council. If, in fact, defendants did not engage in such unlawful behavior, there would be no need to provide a mechanism to resolve it . . . . (Pl. 56.1 Statement, ¶ 113).

In over two hundred entries, the plaintiffs dispute the factual assertions in the defendants' corresponding paragraphs with objections alone. That is, they punctuate their objections with the word "disputed" and fail to cite evidence. The plaintiffs have not provided any authority for this method of contesting a moving party's Local Rule 56.1 statement, and the tactic directly violates the rule. Assuming that the plaintiffs had meritorious objections, they had an alternative to sidestepping the rule; they could have filed a motion to strike. See Glynn v. Bankers Life and Casualty Co., No. 3:02CV1802, 2005 WL 2028698, at *1 (D. Conn. Aug. 23, 2005) (motion to strike is appropriate vehicle to challenge admissibility of summary judgment materials); 11 James Wm. Moore et al., Moore's Federal Practice § 56.14[4][a] (same).

To the extent the plaintiffs proclaim factual assertions to be in dispute without identifying evidence in the record, the plaintiffs thwart the basic purpose of the rule. Therefore, the defendants' motion to strike is granted with regard to all entries in the counterstatement that purport to dispute the defendants' assertions without providing citations to the record. The paragraphs to be struck on this ground are listed in the appendix attached to this opinion under the heading Plaintiffs' Local Civil Rule 56.1 Paragraphs to be Struck. Under Local Rule 56.1(c), facts admitted by the plaintiffs' failure to properly dispute them are deemed admitted for the purposes of the summary judgment motion

only.

B.    <u>Admissibility of Evidence</u>

When ruling on summary judgment, courts need only consider admissible evidence. <u>Raskin v. Wyatt Co.</u>, 125 F.3d 55, 66 (2d Cir. 1997) ("The principles governing admissibility of evidence do not change on a motion for summary judgment."). Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits "be made on personal knowledge, [and] set forth such facts as would be admissible in evidence." Fed. R. Civ. P. 56(e). Accordingly, courts are free to strike or disregard inadmissible statements in parties' summary judgment submissions. <u>See</u> <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 219, 222-23 (2d Cir. 2004); <u>Hollander v. American Cyanamid Co.</u>, 172 F.3d 192, 197-98 (2d Cir. 1999); <u>United States v. Private Sanitation Industry Association of Nassau/Suffolk, Inc.</u>, 44 F.3d 1082, 1084 (2d Cir. 1995); 11 James Wm. Moore et al., Moore's Federal Practice § 56.14[4][a] (affidavits, deposition testimony, and documents containing inadmissible evidence properly disregarded).

1.    <u>Authentication</u>

The defendants challenge the authentication of a group of documents submitted by the plaintiffs in opposition to the motion for summary judgment. (<u>See</u> Exhibits 11, 14-15, 24, 27-29, 33,[2] 34, 47, and 52, attached to the Declaration of John E. Andrews in Opposition to Defendants' Motion for Summary Judgment ("Andrews

---

[2] Exhibits 14 and 33 are identical.

9

Decl.")).[3]  The plaintiffs counter that (1) the burden imposed by the Federal Rules of Evidence for authentication is a low one; (2) the fact of production during discovery implicitly authenticates documents, and the appearance of a Bates stamp number on the document is therefore sufficient to guarantee authenticity; and (3) several of the documents have been identified by witnesses at depositions.

Rule 901(a) of the Federal Rules of Evidence, which governs authentication, requires parties to provide "evidence sufficient to support a finding that the matter in question is what its proponent claims."  The rule "does not erect a particularly high hurdle." United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001) (citation and internal quotation marks omitted).  It is satisfied "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification."  United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir. 2001) (internal quotation marks omitted).  "[T]he standard for authentication, and hence admissibility, is one of reasonable likelihood."  United States v. Pluta, 176 F.3d 43, 49 (2d Cir. 1999) (internal quotation marks omitted).  "If in the court's judgment it seems reasonably probable that the evidence is what it purports to be, the command of Rule 901(a) is satisfied, and the evidence's persuasive force is left to the jury."  Dhinsa, 243 F. 3d at 658 (citation and quotation marks omitted).  Under Rule 901(b)(4), the requirements

_____

[3] All numbered exhibits referenced in this opinion are attached to the Andrews Declaration.

10

are met if the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," indicate that the document is what it is purported to be.

The plaintiffs' argument that the process of discovery provides an implicit guarantee of authenticity is well-founded. In John Paul Mitchell Systems v. Quality King Distributors, Inc., 106 F. Supp. 2d 462 (S.D.N.Y. 2000), the plaintiff sought to introduce corporate records obtained from a defendant during discovery. Because the defendant's custodian of records invoked his right under the Fifth Amendment of the United States Constitution not to testify, the plaintiffs were unable to authenticate the documents through testimony. Id. at 471. The court held that the act of production itself authenticated the documents. However, the court did not rely on the presence of a Bates stamp in its analysis. Rather, the court considered the circumstances under which the defendant produced the document. There was no dispute that the defendant's custodian of records had produced the documents; that fact, along with the fact that had he testified he would have been able to authenticate the document, persuaded the court that the records were admissible. Id. at 472. Nothing in the decision provides authority for authenticating documents on the basis of the presence of a Bates stamp alone.

For reasons set forth below, the documents identified as Exhibits 11, 14, 24, 27, 28, 34 and 52 are sufficiently authenticated to be admitted for the purposes of the summary

judgment motion, and with respect to them, the defendants' motion to strike is denied.  It is granted with respect to one of the documents in Exhibit 29 and the correspondence identified as Exhibit 47.

Exhibit 11 was produced by IPC Communications, Inc., a defendant in this lawsuit.  A party producing a document is in a better position to know whether the document is authentic than the party seeking it in discovery.  It is disingenuous for the producing party to dispute the document's authentication without proffering some basis for questioning it.

Exhibit 14 is a letter dated November 29, 1999, by Harold Lyons, vice president of Lehrer McGovern Bovis, Inc., a general contractor.  The plaintiffs state that the letter was produced in discovery and that it was identified by Fred Lott at his deposition on July 18, 2002.  (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Strike ("Pl. Strike Memo.") at 11.)  However, the plaintiffs have not provided the court with a copy of the cited page of the deposition transcript in which Mr. Lott made the identification.  Nevertheless, taking together the content of the letter, its appearance, the fact that it describes contemporaneous events and opinions, and was written before litigation began, it is reasonably probable that the letter is authentic, and it is therefore admitted.

Exhibit 15, a letter by James D. Alger dated May 26, 2000, is authenticated by a declaration, also in Exhibit 15, in which Mr. Alger identifies the document as a letter he wrote.  An attachment

to the letter, a handwritten memorandum written by Leo Martin, is authenticated by Mr. Alger's reference to it in his letter.  Mr. Alger's letter and the attachment are admitted.

Exhibits 24, 27, 28, and 34 are a series of e-mail exchanges among members of a team at Credit Suisse First Boston ("CSFB") who discussed the particulars of construction and cabling contracts for CFSB construction projects in great detail.  These exhibits were produced in discovery pursuant to subpoena.  The content of the exchanges, in particular the detail about meetings and about progress on construction sites, as well as the fact that they were produced by a third party in response to a subpoena in a lawsuit in which the party has no interest make it reasonably likely that these are authentic, and they are admitted.

Exhibit 29 consists of two types of documents: (1) minutes of March 1999 meetings of a team involved in the construction of offices for the law firm Sherman & Sterling, and (2) an e-mail dated March 10, 2000.  Again, the plaintiffs cite deposition testimony that is not before the court; they state that Michael Yee and Peter Babigian identified the documents at their depositions, (Pl. Strike Memo at 13), but they have not provided copies of the cited pages.  The minutes nevertheless have sufficient internal indicia of authenticity to meet the requirements of Rule 901(a).  They are printed on the letterhead of the general contractor, StructureTone, list the names of team members who attended and those who did not, and describe in considerable detail contemporaneous tasks to be completed.  The same cannot be said of

the March 10, 2000 e-mail, however.  The plaintiffs have offered no proof that it is what it purports to be.  For these reasons, the minutes are admitted but the e-mail is not.

Exhibit 47, a memorandum from Tom Yuen of NBC to Rina Peller of NBC, cannot be admitted because the plaintiffs have not offered any evidence that it is authentic other than the fact that it bears a Bates stamp.  Nor are there internal indicia demonstrating that it is an authentic document.  It is not on letterhead, there are no addresses on it, and it is undated.  This document is therefore struck.

Exhibit 52 consists of bid proposals submitted to the law firm Shearman & Sterling by four contractors, including defendant Adco Electrical Corporation, Nead Electric Company, which the plaintiffs claim is affiliated with defendant Nead Information Systems, and two others.  Each bid is on corporate letterhead and contains significant detail regarding the cost and job requirements of the project.  The defendants are in the best position to draw the Court's attention to any indication that these documents are not authentic, but they have not done so.  These documents are, therefore, admitted.

2.   Hearsay

The defendants seek to strike paragraphs in the plaintiffs' counterstatement and dozens of sentences from the plaintiffs' brief on the basis that the underlying evidence is hearsay.[4]   (See

---

[4] Unless otherwise noted, "plaintiffs' brief" refers to the Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

Statements In Plaintiffs' Brief That Should Be Struck As Inadmissible ("Def. App. A"), attached as Appendix A to Memorandum of Law in Support of Defendants' Motion to Strike ("Def. Strike Memo.")). There is no basis for striking sentences from a legal brief. Parties may draw the inferences they deem appropriate. It is for the decision-maker, in this case, the court ruling on summary judgment, to determine whether the party's inferences and conclusions are persuasive.

The plaintiffs have expressly declined to respond to the defendants' hearsay challenges to evidence in their Local Rule 56.1 counterstatement. They maintain that the defendants' Local Rule 56.1 statement, which is the point of departure for their counterstatement, is an unworkable document for this purpose and limit their advocacy to supporting the contested statements in their brief. (Plaintiffs' Response to Defendants' Appendix A at 1).

The defendants are correct that the plaintiffs have relied on inadmissible hearsay, but they overstate the case. They have minimized the scope of the "state-of-mind" exception found in Rule 803(3) of the Federal Rules of Evidence, which permits evidence of customer motives in antitrust cases; and they have confused perceptions drawn from ordinary inferences with knowledge based on hearsay.

i. Exceptions under Rule 803(3)

Two federal appellate court decisions illustrate the application of Rule 803(3), the "state-of-mind" exception, in

antitrust cases.  In  Callahan v. A.E.V., Inc., 182 F.3d 237 (3d
Cir. 1999), the court reversed, in part, summary judgment granted
in favor of the defendants because the district court mistakenly
excluded evidence it deemed hearsay.  The plaintiffs were beer
retailers who ran "mom-and-pop" beer stores; the defendants were a
supermarket-type beer distributor and employees who had allegedly
applied illegal pressure on a major beer wholesaler to obtain
exclusive discounts.  Id. at 240.  The issue of liability was not
before the appeals court; after excluding deposition testimony, the
district court ruled that the plaintiffs could not prove antitrust
damage.  The excluded evidence included deposition testimony by the
plaintiffs that their customers had reported that they had switched
to purchasing beer from the defendants because of the lower prices.
Id. at 250.  The appeals court held that these hearsay statements
were admissible under Rule 803(3) of the Federal Rules of Evidence
to show why the customers had taken their  business elsewhere --
though not to prove that the defendants engaged in misconduct.  Id.
at 251-52.  "As we have explained, statements of a customer as to
his reasons for not dealing with a supplier are admissible for this
limited purpose, i.e., the purpose of proving customer motive, but
not as evidence of the facts recited as furnishing the motives."
Id. at 252 (quotation and internal punctuation omitted).

Hydrolevel Corporation v. American Society of Mechanical
Engineers, Inc, 635 F.2d 118 (2d Cir. 1981), is a similar case.
There the defendants challenged the statements of a witness who
testified about his conversations with the plaintiff's customers

about their reluctance to purchase the plaintiff's product.  Id. at
128.  The court ruled that the statements were admissible to prove
that antitrust conduct, if otherwise proved, caused damage.  Id.

The plaintiffs maintain that evidence they cited in a section
of their brief titled "In The Terrorem Use of Direct and Indirect
Threats" is admissible under 803(3) to prove their customers'
motives.  (See Pl. SJ Opp. at 17-20).  To the extent the section
is devoted to that purpose, the evidence they cite is properly
admitted under Rule 803(3).  A word of caution is in order, though.
As drafted, the section's purpose is ambiguous.  Its introductory
statements blur the distinction drawn by the courts in Callahan and
Hydrolevel between proving a customer's motive and proving the
facts recited as furnishing the motives:

> In the relatively small, closed community of building
> owners . . . and general contractors in major commercial
> buildings in New York City, it is now clearly understood
> that hiring a CWA contractor will likely create a Local
> 3 problem . . . . As reflected in internal documents and
> the deposition testimony of customers (through their
> representatives) and statements to plaintiffs, Local 3
> and the defendant contractors fostered this extortionate
> environment: either use Local 3 contractors for VDV
> installation or risk the consequences.  Many customers
> admittedly caved in and either refused to award contracts
> to CWA contractors or cancelled existing contracts.

(Pl. SJ Opp. at 17).  A court ruling on summary judgment, however,
can disregard the evidence to the extent that it goes beyond the
limited scope for which it is admitted and weigh it for its proper
purpose.  As discussed below, much of the evidence cited in the "In
Terrorem" section is admissible under Rule 803(3) for the limited
purpose of proving customer intent.

As mentioned earlier in this opinion, Exhibit 15 includes a

letter of Mr. Alger, president of a CWA cabling contractor, in which he stated that soon after his company won a contract to do work on a Manhattan construction project, a Local 3 business agent came to the site and instructed electricians to cease working overtime, and, shortly after that, the project's architect called Mr. Alger to cancel his contract. As cited in the plaintiffs' "In Terrorem" section of their brief and in ¶¶ 71-74, 76, 90 and 103 of the Plaintiffs' Local Rule 56.1 Statement, the evidence is admitted under Rule 803(3). However, as cited in a section of the brief titled "Defendants' Acts of Interference," (Pl. SJ Opp. at 14-17), the evidence is struck because it is offered to prove that the defendants engaged in anticompetitive conduct.

The cited evidence from Exhibit 18 is inadmissible hearsay. Christopher Shannon of Blue Diamond Fiber Optic Networks, Inc. ("Blue Diamond"), one of the plaintiff companies, testified that Qwest Communications International, Inc. ("Quest") had agreed to hire Blue Diamond to install telecommunication cables at a Manhattan construction site but then reassigned the job exclusively to defendant Hugh O'Kane Electric Company ("O'Kane"), after O'Kane electricians already employed at the site ceased working overtime and did not appear for work the following morning. Mr. Shannon obtained this information from Gary Pinney, general manager of Fiber Pro, LLC. (Exh. 18 at 256-60). Mr. Pinney, in turn, obtained the information from Patrick Marshall, a Qwest representative. (Exh. 17, ¶ 8). Had Mr. Shannon's testimony been that Mr. Marshall told him directly about the reassignment, it

would have been admissible under Rule 803(3). However, no exception renders Mr. Pinney's out-of-court remarks to Mr. Shannon admissible. Mr. Shannon's testimony regarding Qwest's reasons for terminating its contract with his company must, therefore, be struck.

In contrast to Mr. Shannon's testimony, his e-mail correspondence with Mr. Marshall in Exhibit 19 is admissible. Mr. Shannon and Mr. Marshall exchanged e-mails in which Mr. Marshall informed Mr. Shannon that until Blue Diamond joined the ranks of Local 3 contractors, Qwest would be unable to hire the company. This exchange falls well within the exception carved out by Rule 803(3).

Michael Lagana is a principal of one of the defendants, U.S. Information Systems, Inc. ("USIS"). In their brief, the plaintiffs cite his testimony as reflected in Exhibit 23 to argue that Equitable Life, Random House, and Globix hired Local 3 contractors to avoid threatened slowdowns and sabotage. (Pl. SJ Opp. at 19-20 (citing Exh. 23 at 283, 288, 590-92, 1060)). The testimony concerning Equitable Life and Random house is admissible under Rule 803(3) for the purpose of showing the motive of the customer. The same is true of the Globix testimony on page 1060. However, Mr. Lagana's testimony that a client told him a general contractor held one of the defendants responsible for damaged electrical cables (Exh. 23 at 1010) is inadmissible.

The plaintiffs also cited Mr. Lagana's testimony in their Local Rule 56.1 statement. The evidence is admitted as cited in

paragraphs 130-32 and 383 (citing Exh. 23 at 597-603), paragraph 327 (citing Exh. 23 at 42-50), and paragraphs 384-386 (citing Exh. 23 at 598, 603). At paragraph 557, pages 490-92 of Mr. Langana's testimony are admitted, but the other pages are not. Pages 952, 956 and 965, cited in paragraph 509, are admitted to prove the truth of the matter asserted, not soley for the limited purpose of Rule 803(3), because the testimony is based on Mr. Lagana's personal knowledge of the refusal to work overtime.

The plaintiffs also cited Exhibits 24, 27-28, and 34. These are e-mails circulated among a team of managers at Credit Suisse First Boston ("CSFB") chronicling decisions the managers made to hire Local 3 contractors instead of CWA contractors, despite their frustration with the higher cost, to avoid the risk of vandalism and work stoppages. As cited in their brief the evidence is admissible (See Pl. SJ Opp. at 1, 28, 19, 25 and 31); as cited in paragraphs 77, 78, and 305 of their Local Rule 56.1 statement the evidence is struck because there the plaintiffs cited the e-mails to prove the underlying misconduct.

Exhibit 30 is a letter of the chief operating officer of PM Contracting Company recommending that Cushman & Wakefield, a real estate management firm, hire one of the defendants, ADCO Electrical Corporation, rather than a CWA contractor because Local 3 members had informed PM Contracting that they would not perform overtime work if a CWA contractor was present at the job site. This is admitted under Rule 803(3).

Exhibit 31 consists of the deposition of David Kaliff, a

principal of Walsh-Lowe, a technology consulting firm. The
plaintiffs cited excerpts where Mr. Kaliff testified about
meetings among representatives of Random House, a general
contractor, and Walsh Lowe. (See Exh. 31 at 180-89, 310-19).[5]
Random House and the general contractor rejected Walsh Lowe's
recommendation to invite CWA contractors, including USIS, to bid
on a cabling job because of the potential for labor unrest at the
construction site. This evidence is admitted as cited in the
brief (Pl. SJ Opp. at 20, 21, and 31), and in paragraphs 130-32 of
the counterstatement under Rule 803(3). Mr. Kaliff also testified
about work conducted a Two Penn Plaza, and those statements are
inadmissable hearsay. (Exh. 31 at 110). As cited in paragraph
226 of the counterstatement, this testimony is struck.

### iii. Personal Knowledge Acquired through Others

The defendants seek to strike evidence given by witnesses
who obtained their knowledge of events through interactions with
other people. Personal knowledge however, is not so narrowly
defined. "Although first-hand observation is obviously the most
common form of personal knowledge, that is not the only basis for
it." 3 J. Weinstein et al., Weinstein's Evidence, § 602.03[1][a].
In Agfa-Gevaert, A.G. v. A.B. Dick Co., 879 F.2d 1518, 1523 (7th
Cir. 1989), Judge Posner pointed out that business executives'
testimony about their products was not hearsay, even though their
knowledge came from engineers instead of from first hand

---

[5] The plaintiffs cited pages 180-84 but the material they
identified extends from page 180 to page 189.

inspection.

> All perception is inferential, and most knowledge
> social; since Kant we have known that there is no
> unmediated contact between nature and thought.
> Knowledge acquired through others may still be personal
> knowledge within the meaning of Fed. R. Evid. 602,
> rather than hearsay, which is repetition of a statement
> made by someone else - a statement offered on the
> authority of the out-of-court declarant and not vouched
> for as to truth by the actual witness.

Id. With respect to Exhibits 7, 9, 12, 14, 16-17, 21, 25, 26, 31-32, 41 and 45, for the most part, the defendants' hearsay objections are without merit because the cited testimony is founded on personal knowledge acquired through others.

Exhibit 7 consists of the deposition transcript of Joseph Ramellini of DVI Communications, Inc., a tel-data consultant who performed as project manager on several sites in New York City. He testified that (1) six or seven firms compete in the medium size cabling market in New York (Exh. 7 at 95-98); (2) it can be "disastrous" to hire electricians to do the more technically demanding aspects of cabling work (Exh. 7 at 220-21); and (3) approximately 600 cables were cut at a site he supervised (Exh. 7 at 127 & 135). The defendants argue that Mr. Ramillini's testimony is based on hearsay. However, all of his testimony rests on knowledge of the marketplace gained through years of experience and his personal knowledge of particular jobs. Mr. Ramillini's testimony is admitted.

In his deposition, the transcript of which is Exhibit 9, an

executive vice president of defendant Nead Information Systems,[6] Robert Eccles, testified that he had met with Howard Cohen, business manager of Local 3, to complain about the number of bids he was losing to lower-priced CWA contractors. (Exhibit 9 at 108). The plaintiffs cited this testimony as evidence of the start of the conspiracy between contractors and Local 3. The defendants' contentions that Mr. Eccles's remarks lack foundation and are hearsay are meritless.

Exhibit 12 consists of the testimony of Fred Lott, construction manager for a hotel company, who testified that after USIS arrived at the construction site of the Sofitel Hotel, (1) one of the defendant contractors, Five Star Electric Company, turned off electrical supply to lights and elevators at the site; (2) Five Star refused to deliver labor to the project; and (3) Rodney Graves, a Five Star assistant superintendent whom Mr. Lott identified as holding a union position, threatened Mr. Lott personally. Mr. Lott testified that he saw Five Star employees shut down lights and power as many as ten times (Exhibit 12 at 109), and witnessed Howie Tenser, a foreman, directing electricians to turn off the power. (Exhibit 12 at 118-19). He testified that he had multiple conversations about the company's refusal to deliver labor with Mr. Tenser, with Robert King, Five Star's project manager, and with Gary Segal, Five Star's

---

[6] The parties dispute whether Nead Information Systems, the named defendant, and Nead Electric, a company that engaged in some of the alleged misconduct charged by the plaintiffs, are distinct entities.

president.  (Exhibit 12 at 106).  Mr. Lott stated that he was told that Mr. Graves held a union position.  (Exhibit 12 at 139).  All of Mr. Lott's testimony is admissible except his statement that he was told that Mr. Graves held a union position.  That statement is hearsay and is struck.

The plaintiffs cited Exhibit 14, a letter written by Harold Lyons, a vice president of Lehrer McGovern Bovis, Inc., the general contractor on the Sofitel Hotel project, in which Mr. Lyons discussed problems Lehrer McGovern Bovis was encountering because of USIS's presence at the construction site.  This information was within Mr. Lyons's personal knowledge as a senior manager of the company performing the services of general contractor over the site and, thus, is admitted.

Exhibit 16 consists of the testimony of Brad Ickes, president of a non-party CWA firm, BMI Telecommunications, who testified that (1) his client, AT&T, called him and told him that 60 fiber cables installed by BMI had been found cut in a manhole; (2) when Mr. Ickes and his employees got to the manhole they found electricians employed by one of the defendants, Hugh O'Kane Electric Company LLC, at the manhole; and (3) and when the BMI employees descended to the splice box inside the manhole they found the message "non-union scum" scrawled on the box.  (Exh. 16 at 191-98).  The plaintiffs offered Mr. Ickes's testimony as evidence that Hugh O'Kane had cut cables of a CWA contractor.  Whether this is the proper conclusion to draw from the evidence is appropriate for determination on summary judgment or at trial, not

here.  The testimony is based on personal knowledge, and the defendants' argument that it is hearsay because Mr. Ickes did not see the cables being cut and was not present when the cut cables were discovered is without merit.

The plaintiffs cited Exhibit 17, the declaration of Gary Pinney, general manager of Fiber Pro, LLC, a fiber optic cabling company.  Mr. Pinney's declaration concerns his efforts to hire one of the plaintiffs, Blue Diamond Fiber Optic Networks, Inc., as a subcontractor on jobs that Fiber Pro performed for Qwest Communications.  Mr. Pinney stated that (1) Qwest agreed to hire Blue Diamond on a job at a site in Manhattan, and that during an initial walkthrough at the site, a Hugh O'Kane shop steward rebuffed an attempt by members of the group, which included Mr. Pinney, to introduce themselves to him (Exh. 17, ¶¶ 5-6); (2) as soon as the group left the site all of the Local 3 members working for Hugh O'Kane walked off the site (Exh. 17, ¶ 7); (3) the shop steward threatened to pull Hugh O'Kane electricians off all Qwest jobs (Exh. 17, ¶ 8); and (4) as a result of the threats, Qwest reassigned the work from Blue Diamond to Hugh O'Kane (Exh. 17, ¶ 8).  The defendants argue that all of these statements are hearsay:  Mr. Pinney did not personally hear the shop steward rebuff the group's overture; he learned about the Local 3 walkout and threats from Patrick Marshall, Qwest's regional splicing manager; and he learned of Qwest's decision to replace Blue Diamond from an unidentified person.

Three of the four statements are admissible.  The first two

are examples of personal knowledge obtained from others. Mr. Pinney was part of the group that attempted to greet the Hugh O'Kane shop steward and could infer from the facts that members of the group approached the shop steward and that the introductions did not take place that the shop steward turned down the overture. Nor was it necessary for Mr. Pinney to personally witness the electricians walking off the job to know that they did so. In contrast, Mr. Pinney's repetition of Patrick Marshall's statement about the shop steward's threat is hearsay because the information is based entirely on Mr. Marshall's statement. The plaintiffs contend that the threats attributed to the shop steward are verbal acts and, hence, not hearsay. They are correct that threats are not hearsay, see Tompkins v. Cyr, 202 F.3d 770, 779 n.3 (5th Cir. 2000); 5 J. Weinstein et al., Weinstein's Evidence, § 801.11[3], and if Mr. Pinney had received the threats himself he could have recounted them, but he was not the recipient. The fourth statement is admissible, under Rule 803(3), to demonstrate causation, which is how the plaintiffs use it.

The plaintiffs cited the testimony of Liz Pastore, facilities manager for Agency.com, a company that undertook an office construction project and engaged both USIS and Nead Electric. (See Exhibit 21). Ms. Pastore testified that (1) the project was on a tight schedule requiring overtime by the electricians (Exh. 21 at 51); (2) as soon as USIS began its portion of the work the Nead electricians stopped working overtime (Exh. 21 at 51); (3) as a result, construction ended two weeks late (Exh. 21 at 63); (4)

there were three incidents of vandalism (Exh. 21 at 42-48, 84-92, 107-08, 111-23, 127, 131, 134, 137-38, 156, 218); and (5) Ms. Pastore believed the general contractor and Nead Electric split the cost of replacing severed cable (Exh. 21 at 107). The plaintiffs cited Ms. Pastore's testimony in their brief as evidence supporting their assertion that Local 3 electricians and the Nead company engaged in misconduct at Agency.com's construction site.

The defendants claim that Ms. Pastore's testimony concerning the work slowdown was hearsay because the employees who stopped working overtime did not personally tell her that they were walking off. This is a misunderstanding of the nature of personal knowledge. Ms. Pastore and representatives of her general contractor, her architects, and Nead Electric held a meeting to talk about the problem as soon as the men stopped working overtime. She did not need to hear directly from the employees to know there was a slowdown. The defendants also claim that Ms. Pastore's testimony about three incidents of severed or nicked telecommunications cables is hearsay because she did not see the damaged cables. But, as she testified, she did see the cut cable in one instance (Exh. 21 at 111), stood directly beneath workers as they inspected the cables in a ceiling installation in the second instance (Exh. 21 at 88-90), and sent one of her employees to the site as soon as she learned of the third severed cable so that she could begin making phone calls to rectify the situation. (Exh. 21 at 123). Ms. Pastore did not need to see the cables to

know they were cut, and her testimony is admitted.  However, her statement that she believed the general contractor and Nead Electric split the cost of new cables was based on hearsay and is struck.  (See Exh. 21 at 107).

Exhibit 22 is the deposition transcript of Dana Reed, an employee of The Nead Organization, who testified that he knew Local 3 electricians had refused to work overtime on the Agency.com project. (Exhibit 22 at 105).  The plaintiffs cited this testimony as evidence of the misconduct of Nead and Local 3. The defendants maintain that Mr. Reed's statement contains hearsay.  The claim is meritless.  Mr. Reed's statement is based on his personal knowledge.

The plaintiffs cited Exhibit 25, the declaration of Stan Walczak, as evidence that Local 3 electricians employed by ADCO Electrical Corporation engaged in misconduct.  Mr. Walczak was senior project manager for NBC's facilities department and oversaw construction of NBC's retail store.  He stated that immediately after USIS began its work at the site, ADCO electricians, who had worked overtime regularly for six months, engaged in work shutdowns, forcing NBC to terminate its contract with USIS and to replace it with ADCO.  (Exh. 25, ¶¶ 9-12).  The defendants contend that Mr. Walczak's statement is hearsay.  The defendants' objection to Mr. Walczak's declaration suffers from the same analytical error as their objections to Ms. Pastore's and Mr. Reed's testimony.  Mr. Walczak did not have to hear directly from the protesting electricians to know that they had ceased working

overtime.    All  of  the  evidence  cited  from  Mr.  Walczak's
declaration is admitted.

Exhibit 26 is the declaration of James R. Kitchen, a manager
for Securities Services and Technologies ("SST"), a company that
installs security systems for commercial clients.  He stated that
(1) his company awarded a subcontract to USIS to install cable on
an AT&T project (Exh. 26 ¶¶ 5-6); (2) shortly after USIS won the
subcontract, Local 3 electricians staged a slowdown (Exh. 26 ¶ 7);
and (3) the AT&T project manager informed Mr. Kitchen that SST
would  have  to  cancel  its  contract  with  USIS  and  retain  Forest
Electric Corporation, which was already performing electrical work
on  the  project  (Exh.  ¶  7).    Mr.  Kitchen  did  not  need  to  learn
directly from the Local 3 electricians that they were engaged in
a  slowdown  to  have  personal  knowledge  of  the  action.    His
repetition  of  what  the  AT&T  manager  told  him  with  respect  to
canceling  the  USIS  contract  is  admissible  to  prove  the  slowdown
caused AT&T to choose a Local 3 contractor over USIS because Mr.
Kitchen's  statement  contains  information  based  on  personal
knowledge.

The plaintiffs cited Exhibit 32, testimony given by Russell
Ramey  of  the  law  firm  Shearman  &  Sterling,  to  support  their
contention that Local 3 contractors and the union worked in tandem
to advance a common agenda.  Mr. Ramey testified that participants
at  construction  project  meetings  routinely  discussed  Local  3
threats.    (Exhibit  32  at  44-46).    He  also  testified  that  Nead's
performance  was  the  worst  he  had  witnessed  in  five  years  of

working as a facilities manager (Exh. 32 at 115-116); that USIS's performance was generally good (Exh. 32 at 121, 144-45); and that Shearman and Sterling was under pressure to hire a Local 3 contractor instead of USIS. (Exh. 32 at 199, 205). The defendants contend that these remarks are hearsay, but Mr. Ramey's knowledge of what took place at meetings, of the strengths and weaknesses of the contractors with whom he dealt, and of the pressures confronting his firm are all part of his personal knowledge. The evidence is admitted.

Exhibit 41 is the declaration of Patrick Marshall, regional splice manager of Qwest Communications International, Inc., who participated in the same events described in Mr. Pinney's declaration, discussed above. Mr. Marshall stated that he was dissatisfied with the performance of O'Kane at Qwest job sites throughout New York City and wanted to hire Blue Diamond to install cabling at a Manhattan site. Mr. Marshall was among the group, described by Mr. Pinney, who performed a walkthrough of the site. He stated that the Local 3 slowdown, which began as soon as the group finished its tour, spread to Qwest sites all over Manhattan and that as a result he reassigned Blue Diamond's work to O'Kane. Within a day and a half, he stated, the walk-out at Qwest's projects throughout the city stopped. All of the cited portions of Mr. Marshall's declaration are based on personal knowledge and are admissible.

Finally, Exhibit 45 consists of the deposition transcript of Richard Mastropolo, an employee of CWA's District 1, which covers

the northeast United States.  He testified that in his position at the CWA District office he responded to complaints from CWA contractors about IBEW threats and attempted to resolve the disputes.  He stated that on one occasion he spoke to Mark Hanson, a business agent of Local 3, about a disruptions at a construction on a site, and Mr. Hansen responded that the situation was beyond his control (Exh. 45 at 135-40).  All of the cited testimony is admitted.  Mr. Hansen's remarks to Mr. Mastropolo are not hearsay at all because they are the admissions of a party opponent, Fed. R. Evid. 801(d)(2), and Mr. Mastropolo's testimony about ongoing disputes between CWA and Local 3 workers is based on his personal knowledge.

iv.  <u>Remaining Hearsay Objections</u>

Statements by a party's employees offered against the party are not hearsay so long as the statements concern a matter within the scope of employment and are made during the term of employment.  Fed. R. Evid. 801(d)(2)(D).  Rule 805 of the Federal Rules of Evidence permits hearsay within hearsay to be admitted as long as "each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."  Fed. R. Evid. 805.

The plaintiffs cited Exhibit 13, the testimony of Robert J. King, Five Star's project manager on the Sofitel Hotel project, and Exhibit 42, the testimony of Salvatore Caputo, chief operating officer for Forest Electric Corporation.  Mr. King testified that (1) the electricians refused to work overtime because of USIS's

presence; (2) he asked Rodney Graves, a Five Star assistant superintendent, and Howie Tenser, a foreman on the Sofitel Hotel project, to speak to the men; and (3) Graves and Tenser reported that they were unable to convince the men to resume working overtime.  (Exh. 13 at 118-21).  Mr. King's testimony that the electricians refused to work overtime is based on his personal knowledge.  His statements about the conversations between Mr. Graves, Mr. Tenser, and the electricians are admissible under admissible under Rules 801(d)(2)(D) and 805 of the Federal Rules of Evidence.

The testimony of Salvatore Caputo, in Exhibit 42, that Phil Altheim, the chief executive officer of Forest, spoke to Mark Hansen of Local 3 to see if he could head off a refusal to work overtime at one of the CFSB construction sites (Exh. 42 at 159-64), is also admitted.

### 3.  Dr. Dunbar's Report

The defendants object to the plaintiffs' citation of reports prepared by Dr. Frederick C. Dunbar, the plaintiffs' expert, charging that the plaintiffs have violated the limitations set by my 2004 determination of the defendants' Daubert motion, U.S. Information Systems, Inc. v. IBEW Local Union Number 3, 313 F. Supp. 2d 213 (S.D.N.Y. 2004).  Specifically, the defendants portray my opinion as prohibiting Dr. Dunbar from testifying about any aspect of liability except that having to do with market conditions, quoting the portion of the opinion that states that Dr. "Dunbar 'would not be permitted to state that the defendants

did or did not engage in anticompetitive conduct.'" (Remaining Bases On Which Statements in Plaintiffs' Brief Should Be Struck As Inadmissible ("Def. Reply App. A"), attached as Reply Appendix A to Defendants' Reply Memorandum of Law in Support of their Motion to Strike, at 65).

This is a misreading of the decision on two counts. First, the ruling does not limit Dr. Dunbar's liability testimony to the subject of market conditions. Rather, it prohibits him from relying on his data sample as a basis for testimony. Id. at 235. In order to test his thesis that the defendants wield monopoly market power, Dr. Dunbar analyzed the prices of contract bids submitted by Local 3 and CWA contractors and found that in each case the Local 3 bid price was considerably higher than the CWA bid. Id. at 228. I found nothing wrong with his method. However, I concluded that his data sample was tainted because the bids were obtained from participants in the particular projects listed in the plaintiffs' complaint. "[I]t can certainly be inferred that the projects identified in the Complaint were the most egregious examples and were likely to reflect a greater price differential." Id. at 234. Nothing in the ruling prohibited Dr. Dunbar from testifying about any of his conclusions based on evidence other than the data sample.

Second, the defendants have mischaracterized the point of the passage they quote. In stating that Dr. Dunbar "would not be permitted to state" that the defendants engaged in anticompetitive conduct, I was merely incorporating the rule that bars expert

witnesses from stating legal conclusions.  Id. at 239-40 (citing Andrews v. Metro North Commuter Railroad Co., 882 F.2d 705, 709-10 (2d Cir. 1989); F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1256, 1258 (2d Cir. 1987)).  It only reiterated that it is for the judge to instruct the jury on the applicable law, and for the jury to apply the law to the facts.  Id. at 240.  Nothing in the prior decision bars Dr. Dunbar from discussing the conduct that is the basis for such a legal conclusion, and, in fact, the opinion goes on to state that Dr. Dunbar "could, however, point to factors that would tend to show anticompetitive conduct in a market."  Id.

The defendants also charge that the plaintiffs have used the expert's reports to channel into evidence hearsay that would otherwise be inadmissible.  The plaintiffs counter that experts may rely on inadmissible evidence in forming their opinions -- so long as experts in the field reasonably rely on such evidence. (Pl. Strike Opp. at 19-20 (quoting Howard v. Walker, 406 F.3d 114, 127 (2d Cir. 2005)).  Although the plaintiffs are correct that under Rule 703 of the Federal Rules of Evidence they may quote Dr. Dunbar's conclusions and opinions, even if he has relied on inadmissible evidence in reaching them, they may not use his report as a "'mere conduit' for the hearsay of another." Wantanabe Realty Corp. v. City of New York, No. 01 Civ. 10137, 2004 WL 188088, at *2 (S.D.N.Y. Feb. 2, 2004); see also Hutchinson v. Groskin, 927 F.2d 722, 725-26 (2d Cir. 1997).

In ruling on the defendants' Daubert motion in this case, I

had occasion to evaluate Dr. Dunbar's reliance on deposition testimony from various witnesses. The defendants had objected to Dr. Dunbar's use of the testimony on the ground that it was insufficiently scientific. They argued "that '[t]here was no economics or science to [Dr.] Dunbar's analysis: he simply read parts of the record then reached a verdict.' (Def. Memo at 6)." U.S. Information Systems, Inc., 313 F. Supp. 2d at 236. I found otherwise. Dr. Dunbar applied his expertise to the facts contained in those depositions and drew conclusions from them. For the most part, he relied on the depositions to provide background on the nature of the market. Id. He also "applie[d] economic principles to determine whether the situation described was one that tended to show economic indicators of market dominance and monopoly leveraging." Id. at 237.

Thus, the plaintiffs may quote Dr. Dunbar's summaries of depositions, even those containing hearsay, to convey his view of the economic background in which the events in this case took place and his expert opinion on whether such economic conditions tend to show market dominance. The plaintiffs have not, however, used his expert opinion in this way in their submissions opposing summary judgment. Rather, they have used his summaries of testimony to prove that the defendants engaged in misconduct.

For example, in their brief opposing summary judgment, the plaintiffs state, "Dr. Dunbar has identified several instances where Local 3 contractors threatened customers so that a competing Local 3 contractor would win the VDV contract, an act which is

35

patently inconsistent with self-interest." (Pl. SJ Opp. at 22). This statement is followed by five illustrations, taken from Dr. Dunbar's report, of Local 3 contractors refusing to work overtime, making threats, and harassing workers:

1. Petrocelli, the high voltage contractor at 5 World Trade Center did not even bid on the VDV job, yet refused to work overtime if the VDV contract was awarded to a CWA contractor. (Ex. 2 (Dunbar Rebuttal Report) at 10 and cited exhibits.)

2. At the Eleven Madison Avenue job, Forest was the electrical contractor and made numerous threats that enabled defendant IPC to get the VDV job. (Id.)

3. At the Institutional Investors project at 255 Park Avenue South, USIS had won the bid and started working, when Forest, doing another job in the same building, not only harassed USIS workers, but informed the general contractor that their electricians would not work overtime and would not utilize cable pulled by USIS so that AJ Electric, a Local 3 contractor, could get the job. (Id.)

4. In the bid meeting on the McGraw Hill job at 2 Penn Plaza, not only did ADCO state that there would be problems if USIS got the contract, but information was circulated that Forest had cut 600 USIS installed cables on another project in the same building. The general contractor selected ADCO. (Id. at 11.)

5. On another McGraw Hill project at 55 Water Street, where USIS was the lowest qualified bidder, ADCO used its control over the job at 2 Penn Plaza so that IPC could get this job. (Id.)

(Pl. SJ Opp. at 22).[7]

As presented here, and in almost every citation in the

_____

[7] Dr. Dunbar relied on hearsay evidence in drafting the report, including CSFB e-mails (Supplemental Report Dr. Fredrick Dunbar Filed Dec. 17, 2002, attached as Exh. 2 to Andrews Decl. at 10-12, nn.19-24). As discussed above, those e-mails are admissible, to prove customer motive only. Dr. Dunbar also relied on Fred Lott's testimony, which as discussed above, is entirely admissible. The plaintiffs may cite Mr. Lott's testimony directly.

plaintiffs' Local Rule 56.1 Statement, the testimony serves to prove misconduct. As such, the plaintiffs' citation of Dr. Dunbar's rebuttal report is struck from their Local Rule 56.1 statement.

C.    Local 3's History of Misconduct

The defendants challenge the plaintiffs' reliance on a series of adverse judicial and administrative decisions documenting Local 3's "total job policy" of using work stoppages, violence, and vandalism to obtain low voltage work. The defendants contend that the rulings are, in essence, character evidence prohibited under Rule 404(b) of the Federal Rules of Evidence. Rule 404(b) bars evidence of prior misconduct to show that a defendant had a propensity to engage in the conduct charged. Fed. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.").

The plaintiffs ask the court to take those rulings into account, arguing that the "total job policy" described in those opinions is in effect today. (Pl. SJ Opp. at 11). Under the "total job policy", all Local 3 members were required to engage in certain improper practices to maintain Local 3's jurisdictional claim over electrical work. The plaintiffs maintain that descriptions in prior opinions of the total job policy –- and the misconduct the policy has induced in members -- are admissible under Rule 406 as evidence of Local 3's routine practice.

Under Rule 406, evidence of an organization's routine

practice is admissible to show that the organization acted "on a particular occasion in conformity with [its] habit or routine practice." Fed. R. Evid. 406. Routine practice evidence is more probative than character evidence because routines consist of automatic, nonvolitional acts. The theory is that an act is more likely to be repeated if it is an automatic response to a particular occurrence than if it requires deliberation. <u>See</u> Fed. R. Evid 406 advisory committee's note. Because there is a risk that routine practice evidence will be used improperly as character evidence, courts insist that proponents of the evidence demonstrate the frequency and consistency of the practice in question. "[A]dequacy of sampling and uniformity of response are the controlling considerations governing admissibility." <u>G.M. Brod & Co. v. U.S. Home Corp.</u>, 759 F.2d 1526, 1533 (11th Cir. 1985); <u>see</u> <u>United States Football League v. National Football League</u>, 842 F.2d 1335, 1373 (2d Cir. 1988).

The plaintiffs' argument is less persuasive than it would have been before 1988. Throughout the 1960s, 1970s, and 1980s, the N.L.R.B. and federal courts repeatedly issued orders to stop Local 3 from engaging in work stoppages, vandalism, and violence to keep CWA contractors out of the tel-data market. <u>See</u> <u>N.L.R.B. v. Local 3, IBEW</u>, 861 F.2d 44, 45-46 (2d Cir. 1988) ("Indeed, we publish this opinion only to render the historical record of Local 3's offenses complete. Since 1960, Local 3 has been found to violate Section 8(b) of the National Labor Relations Act . . . at least twenty-three times . . . ." (citing cases); <u>N.L.R.B. v.</u>

Local 3, IBEW, AFL-CIO, 730 F.2d 870, 880 (2d Cir. 1984) (reprimanding union as "an incorrigible secondary boycotter with a two decade-long history of secondary boycott activity" and identifying multiple adverse rulings); United Technologies Communications Co. v. IBEW, Local 3, 597 F. Supp. 265, 270 n.8 (S.D.N.Y. 1984) (citing multiple adverse rulings); Silverman v. Local 3, IBEW, 81 Civ. 6936, 1981 WL 2234, at *1 n.3 (S.D.N.Y. Dec. 23, 1981) (same).

The plaintiffs in each of these cases challenged the "total job policy," which at the time was embodied in a union by-law.[8] Ultimately, the union removed the offending by-law, but the plaintiffs in this case maintain that the policy is still in force. (Pl. SJ Opp. at 11). According to Thomas Van Arsdale, business manager of Local 3, the IBEW and the CWA have entered a period of labor peace, having signed an agreement some time ago at the national level to handle disputes. (Affidavit of Thomas van Arsdale dated August 23, 2005, ¶ 21).

Whatever the status of the policy, there has been a steep decline in litigation about it in the last eighteen years. In

---

[8] The by-law commanded Local 3 members to bar others tradesmen from performing Local 3 work. Courts repeatedly found the by-law to be an illegal inducement to members to commit acts of violence, vandalism and illegal slowdowns.

> The "total job policy" finds expression in section 12 of Article XIII of the by-laws of Local 3 which are given to members of the Local: "No member is to give away work coming under the jurisdiction of this Local, or to allow any other tradesmen to do work coming under this Local's jurisdiction."

United Technologies, 597 F. Supp. at 270-71 (citation omitted).

contrast to dozens of earlier adverse rulings, there have been only three such decisions since 1988 in New York federal courts. One of these was favorable to Local 3, <u>Building Industry Fund v. Local Union No. 3, IBEW</u>, 992 F. Supp. 162 (E.D.N.Y. 1996); one involved a dispute with a non-union shop over high voltage work, <u>Local Union No. 3, IBEW</u>, 329 NLRB 337 (1999); and the third was brought by the lead plaintiff in this case, <u>Local 3, IBEW</u>, 324 NLRB 604 (1997). The sample is too small to establish that a routine practice of the 1960s through the 1980s extends into the present, and it would distort the sample to permit the plaintiffs to expand it to include the evidence contained in opinions from before 1988. The defendants' motion to strike prior agency and judicial opinions is therefore granted. The sharp decline in the number of opinions, together with the elimination of Local 3's total job policy by-law, require this result.

### 4. <u>Evidence That Fails to Support the Asserted Fact</u>

The defendants argue that the Court should strike statements in the plaintiffs' submissions on the ground that the plaintiffs have cited evidence that does not controvert the defendants' assertions. This argument is entirely without merit. In each instance that the defendants have asserted this argument, their dispute is with the weight of the evidence, not its admissibility. The motion is denied with respect to the defendants request to strike evidence on this basis.

### <u>Conclusion</u>

The rulings contained in this decision are summarized in an

attached appendix. In brief, the defendants' motion to strike is granted with respect to paragraphs in the plaintiffs' Local Rule 56.1 statement that do not conform to the requirements of the rule and with respect to evidence that (1) is unauthenticated, (2) rests on hearsay, or (3) cites Dr. Dunbar's report to prove the defendants' misconduct. The motion is denied with respect to sentences in the plaintiffs' brief and evidence that is subject to a hearsay exception or is otherwise admissible.

Counsel shall contact my chambers promptly to schedule a conference to discuss renewal of the defendants' summary judgment motions.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
August 1, 2006

Copies mailed this date to:

Maxwell M. Blecher, Esq.
John E. Andrews, Esq.
Blecher & Collins, P.C.
515 South Figueroa Street, 17th Fl.
Los Angeles, CA  90071

Laura G. Weiss, Esq.
Law Offices of Laura G. Weiss, PC
One Blue Hill Plaza
P.O. Box 1647
Pearl River, New York  10965

41

James P. Bonner, Esq.
Patrick L. Rocco, Esq.
Shalov Stone & Bonner LLP
485 Seventh Avenue, Suite 1000
New York, New York  10018

Edward T. Byrne, Esq.
Murtagh, Cohen & Byrne
100 North Park Avenue
Rockville Centre, New York  11570

Steven I. Levin, Esq.
Paul G. Burns, Esq.
Levin & Glasser, PC
420 Lexington Avenue, Suite 805
New York, New York  10170

Kevin J. Toner, Esq.
Richard Goldstein, Esq.
Heller Ehrman LLP
7 Times Square
New York, New York 10036

Barry J. Brett, Esq.
Stephen Harmon, Esq.
Daniel Anziska, Esq.
Troutman Sanders LLP
405 Lexington Avenue
New York, New York  10174

John Lundin, Esq.
Richard H. Dolan, Esq.
Jeffrey M. Eilender, Esq.
Schlam Stone & Dolan LLP
26 Broadway
New York, New York  10004

Thomas P. Mohen, Esq.
Domenick P. Leonard, Esq.
Mohen Treacy LLP
186 Birch Hill Road
Locust Valley, New York  11560

38-40, 53-57, 66, 69-70, 82-84, 89, 91-93, 96, 98-102, 108-09, 11-112, 113, 117-119, 121-128, 134-144, 154-162, 164, 166, 169-171, 173, 180-85, 188-96, 202, 204-16, 218-22, 227, 230-35, 237-46, 248-51, 254-58, 260, 264, 273, 275-77, 283-88, 292-93, 295-97, 300-04, 306, 308, 314-16, 319, 322-26, 329-32, 334-35, 345-46, 348-49, 363-64, 368, 374-75, 378-79, 395-437, 449-55, 475-80, 492-94, 500-05, 511, 526, 534, 536, 540-43, 554

## II. HEARSAY RULINGS

This chart presents individual rulings on evidence in the plaintiffs' Local Rule 56.1 statement that the defendants contest as resting on hearsay.

| Paragraph | Cited Exhibits | Determination |
|---|---|---|
| 71-72 | Exh. 15, Alger; Exh. 40, McDonough; Exh. 26, Kitchen | Exhs. 15 and 40: inadmissible as cited here. Exh. 40: admissible. |
| 73 | Exh. 15, Alger; Exh. 40, McDonough; Exh. 26, Kitchen; cases | Exhs. 15 and 40, cases: inadmissible as cited here. Exh. 40: admissible |
| 74 | Exh. 15, Alger; Exh. 40, McDonough; Exh. 26 Kitchen; Exh. 12, Lott; Exh. 13, King; Exh. 17, Pinney; Exh. 22, Reed; cases | Exhs. 15 and 40, cases: inadmissible. Exhs. 26, 12, 13, 17 and 22: admissible. |
| 76 | Exh. 41, Trainor; Exh. 17, Pinney; Exh. 41; Marshall; Exh. 15, Alger; Exh. 40, McDonough; Exh. 26, Kitchen; Exh. 12, Lott | Exh. 41 not provided to the court: no determination. Exhs. 15 and 40: inadmissible as cited here. Exhs. 17, 41, 26 and 12: admissible |
| 77 | Exh. 42, Caputo; Exh. 24, CFSB | Exh. 24: inadmissible as cited here. Exh. 42: admissible. |
| 78 | Exh. 42, Caputo; Exh. 24, CFSB | Exh. 24: inadmissible as cited here. Exh. 42: admissible. |
| 85 | Exh. 21, Pastore | Exh. 21: admissible. |
| 90 | Exh. 12, Lott; Exh. 15, Alger | Exhs. 12 and 15: inadmissible as cited here. |
| 103 | Exh. 15, Alger | Exh. 15: admissible. |
| 130 | Exh. 31, Kaliff; Exh. 32, Ramey; Exh. 23, M. Lagana | Exhs. 31, 32 and 23: admissible. |
| 131 | Exh. 31, Kaliff; Exh. 32, Ramey; Exh. 23, M. Lagana | Exhs. 31, 32 and 23: admissible. |
| 132 | Exh. 31, Kaliff; Exh. 32, Ramey; Exh. 23, M. Lagana | Exhs. 31, 32 and 23: admissible. |

| Paragraph | Cited Exhibits | Determination |
|---|---|---|
| 165 | Exh. 45, Mastropolo | Exh. 45: admissible. |
| 172 | Exh. 15, Alger; Exh. 45, Mastropolo | Exh. 15: not admissible as cited here. Exh. 45: admissible. |
| 224 | Exh. 2, Dunbar supplemental report, at 11-12 | Exh. 2: inadmissible. |
| 226 | Exh. 2, Dunbar supplemental report, at 10; Exh. 46 Conte;[9] Exh. 31, Kaliff | Exhs. 2 and 31 inadmissible as cited here. Exh. 46: admissible. |
| 228 | Exh. 2, Dunbar supplemental report, at 10; Exh. 46 Conte; Exh. 31, Kaliff | Exhs. 2 and 31 inadmissible as cited here. Exh. 46: admissible. |
| 236 | Exh. 2, Dunbar supplemental report, at 11-12 | Exh. 2: admissible. |
| 261 | Exh. 25, Walczak; Exh. 49, Yuen; Exh. 48 NBC 0009; Exh 46 Conte | Exhs. 25 and 46: admissible. Exh. 49: unauthenticated. NBC document listed as Exh. 48 missing and no determination made. |
| 262 | Exh. 25, Walczak; Exh. 49, Yuen; Exh 48 NBC 0009; Exh 46 Conte | Exhs. 25 and 46: admissible. Exh. 49: unauthenticated. NBC document listed as Exh. 48 missing and no determination made. |
| 278-79 | Exh. 2, Dunbar supplemental report, at 12-13 | Exh. 2: inadmissible as cited here |
| 280-82 | Exh. 2, Dunbar supplemental report, at 12-13; Exh. 12, Lott | Exh. 2: inadmissible as cited here. Exh. 12: admissible. |
| 305 | Exh. 28, CFSB e-mails | Exh. 28: inadmissible as cited here. |
| 317 | Exh. 48, J. Lagana; Exh. 49, R Lagana | Exhs. 48 and 49: inadmissible as cited here. |
| 327 | Exh. 23, M. Lagana | Exh. 23: admissible |
| 350 | Exh. 28, CFSB e-mails | Exh. 28: inadmissible as cited here. |
| 361 | Exh. 7, Ramellini | Exh. 7: admissible. |
| 369 | Exh. 2, Dunbar supplemental report, § IIIA (1), (2), (3), (4) and evidence cited therein | Exh. 2: inadmissible as cited here. |
| 373 | Exhs. 1, Dunbar report; and Exh. 2, Dunbar supplemental report, § IIIA (1), (2), (3), (4) and evidence cited therein | Exhs. 1 and 2: inadmissible as cited here. |
| 383 | Exh. 23, M. Lagana | Exh. 23: admissible. |

9 Mr. Conte's deposition is mislabeled in the plaintiffs' briefs as Exhibit 48; it is actually Exh. 46 of the Andrews Decl.

44

| Paragraph | Cited Exhibits | Determination |
|---|---|---|
| 439 | Exh. 2, Dunbar supplemental report, at 9-17 | Exh. 2: inadmissible as cited here. |
| 440-48 | Exh. 2, Dunbar supplemental report, at 9-17; Exh. 51, Gerofsky | Exh. 2: inadmissible as cited here. Exh. 51: admissible. |
| 458-64 | Exh. 2, Dunbar supplemental report, at 10-12 and cited evidence therein | Exh. 2: inadmissible as cited here. |
| 469 | Exh. 29, Ramey e mail | Exh. 29 unauthenticated. |
| 470 | Exh. 2, Dunbar supplemental report, at 10-12 | Exh. 2: inadmissible as cited here. |
| 474 | Exh. 4, Babigian; Exh. 29 | Exh. 4: cited testimony not provided to the court: no determination. Exh. 29 unauthenticated. |
| 506 | Exh. 21, Pastore; Exh. 32, Ramey | Exhs. 21 and 32: admissible. |
| 509 | Exh. 23, M Lagana; Exh. 7, Ramellini | Exhs. 23 and 7: admissible. |
| 512 | Exh. 23, M. Lagana; Exh. 7, Ramellini; Exh. 21, Pastore | Exhs. 23, 7, 21: admissible. |
| 513-21 | Exh. 21, Pastore | Exh. 21: admissible. |
| 522 | Exh. 21, Pastore; Exh. 9, Eccles; Exh. 10 | Exhs. 21, 9 and 10: admissible. |
| 529 | Exh. 21, Pastore | Exh. 21 admissible. |
| 530 | Exh. 21, Pastore; Exh. 7, Ramellini | Exhs. 21, 7: admissible. |
| 533, 535 | Exh. 21, Pastore | Exh. 21: admissible. |
| 547-50, 552 | Exh. 32, Ramey | Exh. 32: admissible. |
| 557 | Exh. 23, M. Lagana | Exh. 23: pages 590-92, admissible; the rest inadmissible. |
| 559-61 | Exh. 1, Dunbar report; Exh. 2, Dunbar supplemental report and evidence cited therein | Exhs. 1 and 2: inadmissible as cited. |
| 562-63 | Exh. 1, Dunbar report; Exh. 2, Dunbar supplemental report and evidence cited therein; Exh. 21 Pastore | Exhs. 1 and 2: inadmissible as cited. Exh. 21: admissible. |